**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
Todd S. Garber
D. Greg Blankinship
Sami Ahmad
1 N Broadway Suite 900
White Plains, NY 10601
(914) 298-3290
tgarber@fbfglaw.com
gblankinship@fbfglaw.com
sahmad@fbfglaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| POUGHKEEPSIE WATERFRONT DEVELOPMENT LLC, on behalf of itself and all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION** |
| | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | **DEMAND FOR JURY TRIAL** |
| THE TRAVELERS INDEMNITY COMPANY OF AMERICA, and THE TRAVELERS COMPANIES, INC. | |
| Defendants. | |

Plaintiff Poughkeepsie Waterfront Development, LLC ("Poughkeepsie" or "Plaintiff"), by way of Complaint against Defendants The Travelers Indemnity Company of America, and The Travelers Companies, Inc. (collectively, "Travelers" or the "Defendants") alleges as follows:

## I.     INTRODUCTION

1.     In December 2019, the infectious Coronavirus ("COVID-19") disease emerged in Wuhan, China, rapidly spreading to Europe and the United States, reaching New York State by March 2020.[1]

2.     On January 30, 2020 the World Health Organization (the "WHO") declared a public health emergency of international concern.  Six weeks later, on March 11, 2020, the WHO assessed COVID-19 as a global pandemic.[2]

3.     On March 16, 2020, the White House, the Center for Disease Control and Prevention (the "CDC"), and members of the US national Coronavirus Task Force issued guidance to the American public, titled "30 Days to Slow the Spread" for stopping the spread of COVID-19 in the United States.[3]  This guidance advised individuals to adopt extensive social distancing measures, including working from home for all non-essential businesses, avoiding discretionary travel and gatherings of more than 10 people, and staying away from public venues.[4]

---

[1] *See* Melanie Grayce West, *First Case of Coronavirus Confirmed in New York State*, The Wall Street Journal (March 1, 2020) https://www.wsj.com/articles/first-case-of-coronavirus-confirmed-in-new-york-state-11583111692.

[2] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (March 11, 2020) https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *See* The Whitehouse, Coronavirus Guidelines for America, *30 Days To Slow The Spread* (March 16, 2020) https://www.whitehouse.gov/briefings-statements/coronavirus-guidelines-america/.

[4] *See id.*

4.      The result of these government-mandated restrictions and prohibitions has threatened the survival of many businesses, especially small and medium enterprises which have been forced to shut down operations, lose cash flow, and furlough employees -- while continuing to pay for substantial existing obligations and overhead.  The COVID-19 crisis is especially acute for non-essential businesses, including businesses dependent on their ability to tenants operate on their premises, allow customers to visit, and pay rent.

5.      Most businesses insure against unforeseen catastrophic events like the ongoing COVID-19 pandemic and the subsequent government-mandated closures through general commercial property insurance policies.  These contractual policies promise to indemnify policyholders for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed.  This coverage is commonly known as business interruption or "loss of income" coverage and is standard in most general commercial property insurance policies.[5]

6.      The State of New York requires that insurance companies operating there must conduct fair, balanced and thorough investigations of all bases of claims for benefits made by insured entities.  As part of their obligations, insurance companies are required to search for and consider evidence that supports coverage of the claimed loss, and in doing so must "resolve any ambiguities in the policyholders' favor promptly and diligently."[6]

---

[5] *See* Kimberly Lankford, *What Is Business Interruption Insurance?*, U.S. News & World Report (April 8, 2020) https://money.usnews.com/money/personal-finance/saving-and-budgeting/articles/what-is-business-interruption-insurance.
[6] *See* New York Department of Financial Services, *Insurance Circular Letter No. 11 (2019)* (September 12, 2019) https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_11.

7.    Plaintiff purchased Commercial General Liability Coverage from Defendants on September 3, 2019, for a period from September 1, 2019 through September 1, 2020.  Defendants have reneged on their obligations and have refused to cover business income losses and other covered expenses incurred by Plaintiff caused by the government-mandated COVID-19 pandemic closure.

8.    Consistent with New York insurance claims handling standards, Plaintiff had the right to rely on Defendants to handle its insurance claim for business interruption losses in a manner consistent with the standards of good faith and fair dealing.  Unfortunately for Plaintiff, Defendants denied the claim in its entirety.

9.    This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop its spread triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that curtail policyholders' business operations, and finds that Defendants are liable for the corresponding business losses suffered by policyholders.

10.    This action brings a claim against Defendants for the breach of their contractual obligations under common general commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 pandemic.

11.    Plaintiff brings this action on behalf of a proposed class of Travelers insurance policyholders who paid insurance premiums in exchange for commercial insurance policies that included lost business income and extra expense coverage.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of Defendants.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because it is where a substantial part of the events or omissions giving rise to the claim occurred and where the insured business that is the subject of the action is situated.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants do business in this District and thus reside in this District pursuant to 28 U.S.C. § 1391(c).

## III.    PARTIES

14.    Plaintiff Poughkeepsie Waterfront Development, LLC is a New York corporation founded in 2003.  Poughkeepsie's premises are located in Poughkeepsie, Dutchess County, New York and its mailing address is located in New Windsor, Orange County, New York. Poughkeepsie is the landlord for the building and property at 176 Rinaldi Boulevard in Poughkeepsie -- the location of Shadows on the Hudson restaurant and The Grandview event venue.

15.    As a property management entity, Poughkeepsie's business depends on, among other things, its premises being open, customers being able to visit its premises, its tenants being able to conduct business on Poughkeepsie's property, and ultimately Poughkeepsie's tenants ability to pay rent.

16.     Defendant The Travelers Companies, Inc. is a major U.S. insurance company.  The Travelers Companies, Inc. is headquartered in New York, New York.  The Travelers Companies, Inc. operates several subsidiaries.

17.     The Travelers Indemnity Company of America is an insurance and indemnity company based in Hartford, Connecticut.  The Travelers Indemnity Company of America is a subsidiary of The Travelers Companies, Inc.

18.     Defendants issued Policy 680-9N996689 (the "Policy") to Plaintiff on September 3, 2019.  Plaintiff has paid all Policy premiums charged by Defendants under the insurance agreement to ensure coverage for lost business income and surplus expenses caused by involuntary business interruptions.

## IV.     FACTUAL BACKGROUND

### A.  The COVID-19 Pandemic Causes Business Closures

19.     Viruses in the Coronavirus family, including the Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have infected humans and caused the loss of life since as early as 2002.

20.     In December 2019, an initial cluster of patients with an unknown viral pneumonia was found to be linked to the Huanan Market in Wuhan, China.[7]

21.     By January 2020, viral testing had allowed scientists to identify SARS-CoV-2, an RNA virus with a crown-like appearance.  Named after its crown-like structural proteins, the virus envelope has a crucial role in virus pathogenicity as it promotes rapid viral assembly and release.[8]

---

[7] *See*  World Health Organization, *Pneumonia of unknown cause – China* (January 5, 2020) https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/.
[8] *See* Cascella M, Rajnik M, Cuomo A, et al. *Features, Evaluation and Treatment Coronavirus (COVID-19)* (April 6, 2020) https://www.ncbi.nlm.nih.gov/books/NBK554776/.

22.    The first confirmed case of the virus outside China was diagnosed on January 13, 2020 in Bangkok, Thailand with the number of cases increasing rapidly worldwide.  On January 30, 2020, the World Health Organization (WHO) declared the SARS-CoV-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the virus was named "COVID-19" by the WHO Director-General.  As of June 22, 2020, the WHO reports over 8.6 million confirmed cases of COVID-19 globally and over 450,000 deaths, with the United States having suffered more than 1.2 million confirmed cases and approximately 120,000 deaths -- higher than any other country.[9]

23.    COVID-19 symptoms vary from severe and fatal cases of respiratory failure requiring ventilation and intensive care support, to mild and asymptomatic effects requiring no further medical attention.  Severe cases of COVID-19 include pneumonia, fever, cough, and dyspnea.  There are currently no certain treatments for COVID-19, and while vaccine development remains in progress, it is uncertain when treatment will be proven, tested, and available to the public.

24.    COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.  Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.  Studies reveal that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.

---

[9] *See* World Health Organization, *Coronavirus disease (COVID-19) Situation Report – 154* (June 22, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200622-covid-19-sitrep-154.pdf?sfvrsn=d0249d8d_2.

25.     The incubation period for COVID-19, i.e. the time between infection and the manifestation of symptoms, averages 5-6 days.  However, it can be up to 14 days.  During this period, also known as the "presymptomatic" period, infected persons can be contagious.  For that reason, transmission from a pre-symptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.  Asymptomatic persons can still transmit the virus to others.

26.     Besides human-to-human contamination, the WHO and medical experts have determined that the virus can survive on contaminated objects and surfaces -- for up to nine days according to one study.  As a result, all physical premises can be affected by secondary COVID-19 contagion, even when infected persons are not physically present.  This directly impacts the physical premises of virtually all businesses.

27.     In the absence of a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human to human and surface to human exposure.  The CDC's website advises that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.

28.     As a result of the primary and secondary exposure risks to COVID-19, the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as consistent hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.  Because these recommendations have been unable to neutralize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing all non-essential business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms,

schools, and other non-essential commercial businesses such as Plaintiff's, and mandating social distancing among the population.[10]

29.    Beyond the COVID-19 virus' own impact, government-mandated closures anticipating the virus' spread have caused the severe curtailment to the effective shutdown of many sectors of the United States economy.[11]  Thus, many businesses have been adversely impacted by civil authorities' lockdown orders without having been impacted by the virus itself.

30.    As of May 29, 2020, virtually all states had implemented at least a partial closing over the course of the COVID-19 pandemic.[12]  Many states had launched partial re-openings after previously implementing more complete shutdowns by this time, however.

31.    In New York State, all non-essential businesses were ordered closed under Governor Cuomo's 'New York State on PAUSE' executive order issued on March 20, 2020.  The Order's purpose is to prevent COVID-19's spread through "social distancing and density reduction measures" and its effects have subsequently been extended.[13]

---

[10]*See, e.g.*, Dutchess County Government, *Dutchess County Announces State of Emergency* (March 13, 2020) https://www.dutchessny.gov/Departments/County-Executive/Dutchess-County-Announces-State-of-Emergency.htm.

[11] *See* Business Insider, *More than half of the US population is now under orders to stay home — here's a list of coronavirus lockdowns in US states and cities* (April 1, 2020) https://www.businessinsider.com/states-cities-shutting-down-bars-restaurants-concerts-curfew-2020-3

[12] *See* The New York Times, *See Which States Are Reopening and Which Are Still Shut Down* (last visited May 14, 2020) https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

[13] *See* New York State, *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order* (March 20, 2020) https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order; *see also* New York State, *Amid Ongoing COVID-19 Pandemic, Governor Cuomo Announces 'NYS on PAUSE' Extended until May 15* (April 20, 2020) https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-announces-nys-pause-extended-until-may-15; *see also* New York State, *No. 202.31: Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency* (May 14, 2020) https://www.governor.ny.gov/news/no-20231-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

**B. Plaintiff's Insurance Policy**

32.     Plaintiff's Policy includes Commercial General Liability Coverage policy, Form CG T1 00 02 19, which covers losses or "property damage" to Plaintiff's covered premises resulting from virtually all risks other than those expressly described under a Policy "Exclusion". Plaintiff's Policy is attached hereto as Exhibit A.

33.     Plaintiff's Policy, as well as the policies of other Class Members, are Defendants' standard commercial insurance forms.  Plaintiff currently has valid commercial insurance coverage under the Policy through September 1, 2020.

34.     Plaintiff's Policy includes a General Aggregate limit of $2,000,000, a Damage to Premises Rented limit of $1,000,000, and a Business Income/Extra Expense Limit of $1,000,000.

**C. Plaintiff's Factual Allegations**

35.     Plaintiff's Policy includes Business Income and Extra Expense Coverage, which requires Defendants to indemnify Plaintiff for its lost income and profits under circumstances where Poughkeepsie's business is forced to suspend operations.

36.     The Policy's Business Income and Extra Expense Coverage is described in Form MP T1 02 02 05 entitled "Businessowners Property Coverage Specialty Form", which includes an obligation by Defendants to pay Plaintiff's lost income:

> 3. Business Income and Extra Expense Business Income and Extra Expense is provided at the premises described in the Declarations when the Declarations show that you have coverage for Business Income and Extra Expense.
>      a. Business Income

(1) Business Income means: (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred, including: (i) "Rental Value"; and (ii) "Maintenance Fees", if you are a condominium association; and (b) Continuing normal operating expenses incurred, including payroll. (2) We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located. (3) With respect to the requirements set forth in Paragraph (2) above, if you rent, lease or occupy only part of the site at which the described premises are located, the described premises means: (a) The portion of the building which you rent, lease or occupy; and (b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

b. Extra Expense (1) Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss. (2) We will pay Extra Expense (other than the expense to repair or replace property) to: (a) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (b) Minimize the "suspension" of business if you cannot continue "operations". (3) We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph a. Business Income, above.

37.     The Business Income and Extra Expense Coverage Form also includes Extended

Business Income provisions:

c. Extended Business Income If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph a. Business Income above, we will also pay for the actual loss of Business Income you sustain during the period that: (1)

Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and (2) Ends on the earlier of: (a) The date you could restore your "operations" with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage occurred; or (b) Sixty consecutive days after the date determined in Paragraph (1) above. However, this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

d. If the Declarations show for Business Income and Extra Expense: (1) Actual loss for 12 consecutive months, then we will pay for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage; or (2) Actual loss up to 12 consecutive months subject to a maximum dollar limit, then we will pay for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage, subject to the limit shown in any one occurrence.

38.     Under the Policy, insurance is extended to apply to the actual loss of business income sustained and the actual, necessary and reasonable extra expenses incurred when access to Poughkeepsie's Insured Property is prohibited by order of civil authority as the direct result of a covered cause of loss to property in the immediate area of Plaintiffs' Insured Property.  This additional coverage is identified as coverage under "Civil Authority":

g. Civil Authority (1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, that are within 100 miles of the described premises, caused by or resulting from a Covered Cause of Loss. (2) The coverage for Business Income will begin 24 hours after the time of that action and will apply for a period of three consecutive weeks after coverage begins. (3) The coverage for Extra Expense will begin immediately after the time of that action and will end when your Business Income coverage ends for this Coverage Extension.

39.    The Policy is broad-based, and as was reasonably understood by Plaintiff, the Covered Causes of Loss include *all* risks of direct physical loss, including those resulting from civil authority action.

40.    The Policy includes a Virus Exclusion for "Virus Or Bacteria", Form IL F0 63 05 13 which entails that:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

41.    Plaintiff and all similarly situated Class members have suffered direct physical loss, loss of business, and damage to their property because they have been unable to use their properties for their intended purposes.

42.    The Virus Exclusion is not applicable because Plaintiff's and other class members' losses were not caused by a "virus, bacterium, or other microorganism", and there is no indication that the COVID-19 virus impacted Plaintiff's premises or caused it to incur any virus-related expenses.  Instead, Plaintiff's and Class Members' losses were solely the result of precautionary measures taken by Plaintiff at the behest of New York State and the federal government to prevent the prospective spread of COVID-19.  Similarly, Plaintiff's physical losses are not a result of a "denial of access" because of COVID-19's presence but because of civil authority mandate.

43.    Currently, Plaintiff is being denied coverage under the Policy despite having contracted with and reasonably relied upon Defendants' Policy provisions.

44.    Plaintiff incurred physical losses, was forced to shut down on March 16, 2020, and requested that Defendants cover the business losses he incurred because of the civil authority COVID-19 shutdown on April 28, 2020.  Reasonably expecting that its insurance Policy would be

honored, Plaintiff submitted a claim, requesting that Defendants honor their commitment to provide insurance coverage for income and shutdown losses.

45.     Shortly thereafter on May 4, 2020, Defendants responded with a letter denying Plaintiff's claim for business income and extra expense coverage.  Defendants' Response Letter is attached hereto as Exhibit B.

46.     First, Defendants claimed that Plaintiff's premises had not suffered direct physical loss or damage for purposes of that coverage claim, claiming that "The presence or possible presence of the COVID-19 virus does not constitute 'direct physical loss or damage to property' within the meaning of your policy."

47.     Second, Defendants claimed that the Virus Exclusion precluded Plaintiff's claim because the Policy does not allow coverage for viruses or their results.

48.     Defendants' primary argument is hollow because Plaintiff has suffered both physical losses and other damages as a result of the civil mandated closure of Poughkeepsie's premises.

49.     As drafter of the Policy, if Travelers had wished to exclude "physical loss *or* damage" resulting from government mandated precautionary measures, it could have used explicit language stating such a definition of "physical loss or damage".  Travelers, however, did not. Under the most reasonable interpretation of the policy, Plaintiff has suffered both physical losses and other damages as a result of the State of New York's COVID-19 pandemic orders closing Poughkeepsie's premises.

50.     Furthermore, based on the Policy language, the Virus Exclusion should not prevent Plaintiff's business income claims because Plaintiff's, and other class members', losses were not caused by a "virus, bacterium, or other microorganism that causes disease, illness, or physical

14

distress or that is capable of causing disease, illness, or physical distress". Rather, the actual and proximate causes of Plaintiff's and other Class Members' losses were the precautionary measures taken by the State of New York, other states, and the federal government to prevent the prospective spread of COVID-19, not because coronavirus was found in or on Plaintiff's insured property. Thus, Plaintiff's business losses are within the scope of the commercial insurance Policy it contracted for.

51.    Defendants also described reasons for denying civil authority coverage: first that the civil authority must prohibit access to the described premises, second that the physical access must be due to direct physical loss of or damage to property, and third that the physical loss or damage must be caused by or resulting from a covered cause or loss.

52.    Besides Defendants expanding the criteria stated in the Policy's Civil Authority section, none of their stated reasons apply: contrary to Defendants' claims, Plaintiff was prohibited from accessing the premises by government action, the closure was caused by direct physical loss of or damage to property, and the closure was caused by a covered cause or loss because Defendants' virus exclusion does not apply, as discussed above.

53.    Defendants' reference to other exclusions do not apply either: none of the ordinance or law exclusions apply to the 2020 COVID-19 shutdown.   And the pollutant/contaminant exclusion fails for the same reason as the Virus Exclusion: no pollutant or contaminant was found on Plaintiff's property -- the government-mandated shutdown was an independent event from actual contamination of Plaintiff's property.

**D.  The COVID-19 Pandemic has
Affected Travelers' Insurance Policyholders Nationwide.**

54.    Fallout from the COVID-19 pandemic is physically impacting private commercial property in New York and throughout the United States and threatening the survival of thousands

of commercial businesses that have had their business operations suspended or curtailed by order of civil authorities.

55.    The overwhelming majority of states have implemented "stay-at-home" orders, and although some are currently rolling back restrictions, it remains in effect in New York and has had a devastating impact curtailing Plaintiff's regular business for the past several months and is likely to continue to do so.

56.    Defendants seeks to avoid covering commercial losses caused by civil authorities' response to the COVID-19 pandemic.

57.    For example, in response to Congressional inquiry, insurance industry trade groups have stated: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."[14]

58.    Other state governments have adopted a different approach, anticipating that insurance companies will breach their obligations to provide coverage for business losses due to the COVID-19 pandemic closures.  These states have introduced bills requiring every insurance policy insuring against loss or damage to property, which includes the loss of use and occupancy and business interruption, be construed to include, among other covered perils, coverage for business interruption because of global virus transmission or pandemic.

---

[14] Insurance Journal, *Insurers Reject House Members' Request to Cover Uninsured COVID Business Losses* (March 20, 2020) https://www.insurancejournal.com/news/national/2020/03/20/561810.htm.

59.     The State of New York supports COVID-19 business interruption coverage based on the relevant policy not having a pandemic exception and the claim being related to actual property damage.[15]

60.     Moreover, a New York State Assembly held on March 27, 2020 requires that "certain perils be covered under business interruption insurance during the coronavirus disease 2019 (COVID-19) pandemic" and stated that:

> Notwithstanding any provisions of law, rule or regulation to the contrary, every policy of insurance insuring against loss or damage to property, which includes, but is not limited to, the loss of use and occupancy and business interruption, shall be construed to include among the covered perils under that policy, coverage for business interruption during a period of a declared state emergency due to the coronavirus disease 2019 (COVID-19) pandemic.[16]

61.     A declaratory judgment determining that the business income loss and extra expense coverage provided in common all-risk commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent the Plaintiff and similarly situated Class members from being denied critical coverage for which they have paid.

## V.      CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons similarly situated.

63.     The Nationwide Class is defined as:

> All Person or Businesses who have entered into standard all-risk commercial property insurance policies with Travelers, where such policies provide for

---

[15] New York State Department of Financial Services, Coronavirus: Business Interruption Insurance (last visited May 14, 2020)
https://www.dfs.ny.gov/consumers/coronavirus/business_interruption_insurance_faqs.
[16] *see* Sate of New York (Assembly 10226) (March 27, 2020)
https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A10226&term=2019&Summary=Y&Text=Y.

business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities to stop the spread of COVID-19.

The New York Sub-Class is defined as:

All New York Citizens or Businesses who have entered into standard all-risk commercial property insurance policies with Travelers, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by state authorities to stop the spread of COVID-19.

Excluded from each class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

64.    Plaintiff reserves its right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

65.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**A.  Numerosity**

66.    This action satisfies the requirements of Fed.R.Civ.P. 23(a)(1).  The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses.  Travelers sells many insurance policies in the State of New York and most, if not all, other states and therefore joinder of the Class members is impracticable.

67.    The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Travelers's or their agents' books and records.  Plaintiff

anticipates providing appropriate notice to the certified Class in compliance with Fed.R.Civ.P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**B.  Typicality**

68.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Travelers.  Each Class member's insurance policy contains the same form providing coverage for business income loss.  None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the rights and obligations of all Class members.

**C.  Adequacy of Representation**

69.     Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiff has no interests antagonistic to or in conflict with other members of the Class.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**D.  Commonality**

70.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(2) because there are questions of law and fact that are common to each of the classes.  These common questions predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Class include, but are not limited to:

     a.     Whether there is an actual controversy between Plaintiff and Travelers as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

     b.     Whether state and federally mandated measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiff's and the Class members' standard all-risk commercial property insurance policies;

     c.     Whether measures implemented by civil authorities to stop the spread of COVID-19 caused business interruptions including physical loss and damage to covered commercial property;

     d.     Whether Travelers repudiated and breached the all-risk commercial property insurance policies issued with business interruption coverage by seeking to deny claims for coverage; and

     e.     Whether Plaintiff and Class members suffered damages as a result of the anticipatory breach by Travelers.

### E. Superiority/Predominance

71.    This action satisfies the requirements of Fed.R.Civ.P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.  The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with the Defendants across multiple states.

72.    Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to Travelers, by even a small fraction of the Class members, would be enormous.

73.    The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.   Class adjudication is superior to other alternatives under Fed.R.Civ.P. 23(b)(3)(D).  Class treatment will also mitigate the risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

74.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

75.    Plaintiff incorporates by reference all paragraphs above as if set forth in full in this cause of action.

76.    Plaintiff entered into a contract, the Policy, with Defendants.  Defendants owed duties and obligations to Poughkeepsie under the Policy.

77.    Plaintiff performed all that the Policy required it to do, including the consistent payment of premiums specified by Defendants.

78.     In the business interruption coverage, Defendants agreed to pay for their insureds' actual loss of Business Income sustained due to the necessary suspension of Poughkeepsie's operations during the "period of restoration."

79.     Defendants also agreed to pay for their insureds' actual loss of Business Income sustained due to the interruption of their operations during the disruption period caused by direct physical loss or damage.

80.     Defendants' Policy language defines "Business Income" as Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred.

81.     The Closure Orders caused direct physical loss and damage to Plaintiff's and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties.  Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiff's and the other Class Members' Travelers policies.

82.     Travelers's denial of Plaintiff's claim is not in accordance with the terms of the Policy and New York law.

83.     Travelers has breached their contractual duties of good faith and fair dealing owed to Plaintiff in the following respects:

    a.     Unreasonably acting or failing to act in a manner that deprives Poughkeepsie of the benefits of the Policy;

    b.     Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives its insureds of the benefits of policies it issues;

    c.     Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Poughkeepsie's claim;

22

d.    Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under policies it issues;

e.    Unreasonably failing to diligently search for and consider evidence that supports coverage of Poughkeepsie's claim;

f.    Unreasonably engaging in a pattern and practice of failing of failing to diligently search for and consider evidence that supports coverage of claims;

g.    Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Poughkeepsie's business interruption and closure losses;

h.    Unreasonably of failing to conduct an investigation to determine the actual and proximate causes on claims made by the insureds;

i.    Unreasonably failing to consider Plaintiff and other Class Members' interests;

j.    Unreasonably failing to apply the Policy's definitions and terms to determine whether Poughkeepsie's claim was covered; and

k.    Unreasonably compelling Poughkeepsie to institute this action to obtain benefits due under the Policy.

84.    Plaintiff is informed and believes, and thereon alleges, that the foregoing unreasonable, malicious, oppressive and/or fraudulent misconduct was not limited to Travelers's evaluation of this particular claim, but represents an ongoing pattern and practice, which it applies to all of its policyholders, that is specifically designed by Travelers to earn illicit profits at the

expense of its policyholders' rights.  This ongoing pattern of conduct constitutes institutional bad faith.

85.    Travelers's institutional bad faith constitutes reprehensible conduct because it is part of a consistent pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in Defendants' policies and practices, specifically as in response to the COVID-19 pandemic. Plaintiff is informed and believes and thereon alleges that Defendants have engaged in similar wrongful conduct as to other insureds and that it has substantially increased its profits as a result of causing similar harm to others.

86.    As a direct and proximate result of Travelers's conduct and breach of its contractual obligations, Plaintiff has suffered damages under the Policy in an amount to be determined according to proof at the time of trial, and other foreseeable and consequential damages according to proof and in amounts to be determined at the time of trial.

87.    As a further proximate result of Defendants' unreasonable conduct, Plaintiff was compelled to retain legal counsel to obtain the benefits due under the Policy.  Therefore, Travelers is liable to Plaintiff for the attorneys' fees reasonably necessary and incurred by Plaintiff in order to obtain the Policy benefits.

88.    Defendants' conduct was intended to cause injury to Plaintiff; and/or was conduct carried on by Defendants with a willful and conscious disregard of Plaintiff's rights, subjected Plaintiff to unjust hardship in conscious disregard of its rights; and/or constituted an intentional misrepresentation or concealment of a material fact known to Defendants with the intention to deprive Plaintiff of property or legal rights or to otherwise cause injury.  Plaintiff is therefore

entitled to an award of punitive damages in an amount appropriate to punish and set an example for other similarly situated insurers.

89.    Defendants' conduct was undertaken by its corporate officers, directors or managing agents who were responsible for claims supervision and operations, underwriting, communications, and/or decisions; and/or this conduct was authorized by one or more of Defendants' officers, directors or managing agents; and/or one or more of Defendants' officers, directors or managing agents knew of the actions and adopted or approved that conduct after it occurred. This conduct was, therefore, undertaken on behalf of Defendants.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment – Business Income Coverage)

90.    Plaintiff repeats the allegations set forth in paragraphs 1-89 as if fully set forth herein.

91.    Plaintiff's Travelers Policy, as well as those of the other Class Members, are contracts under which Travelers was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

92.    Plaintiff and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Travelers or Travelers is estopped from asserting them, and yet Travelers has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide the coverage to which Plaintiff and Class Members are entitled.

93.    Travelers has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

94.    An actual case or controversy exists regarding Plaintiff's and the other Class Members' rights and Travelers's obligations under the Policies to reimburse Plaintiff's and Class Members for the full amount of Business Income losses incurred by Plaintiff's and the other Class Members in connection with the suspension of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

95.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class Members seek a declaratory judgment from this Court declaring the following:

      a.    Plaintiff's and the other Class Members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

      b.    Travelers is obligated to pay Plaintiff and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

### THIRD CAUSE OF ACTION

#### (Declaratory Judgment – Civil Authority Coverage)

96.    Plaintiff repeats the allegations set forth in paragraphs 1-95 as if fully set forth herein.

97.    Plaintiff brings this Count individually and on behalf of the other Class Members.

98.     Plaintiff's Travelers Policy, as well as those of the other Class Members, are contracts under which Travelers was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

99.     Plaintiff and Class Members have complied with all applicable provisions of their policies, and yet Travelers has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

100.    Travelers has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

101.    An actual case or controversy exists regarding Plaintiff's and other Class Members' rights and Travelers's obligations under the Policies to reimburse Plaintiff and other Class Members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

102.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class Members seek a declaratory judgment from this Court declaring the following:

    a.      Plaintiff's and other Class Members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

    b.      Travelers is obligated to pay Plaintiff and other Class members the full amount of the state and federal Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

27

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals, demands judgment against the Defendants as follows:

1) Declaring this action to be a proper class action maintainable pursuant to Federal Rule of Civil Procedure 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

2) Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

3) Awarding Plaintiff and the Class compensatory damages from Travelers's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

4) Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff and the Class's counsel and experts, and reimbursement of expenses; and

5) Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

6) Awarding such other and further relief the Court deems just, proper, and equitable.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all claims so triable.

28

Case 7:20-cv-04890-KMK    Document 1    Filed 06/25/20    Page 29 of 29

Dated: June 25, 2020                    By: */s/ Todd S. Garber*

Todd S. Garber (NY Bar No. 4129300)

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
Todd S. Garber
D. Greg Blankinship
Sami Ahmad
1 N Broadway Suite 900
White Plains, NY 10601
(914) 298-3290
tgarber@fbfglaw.com
gblankinship@fbfglaw.com
sahmad@fbfglaw.com

*Attorneys for Plaintiff*